IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

CARLOS VILLARREAL,           §
                             §
        Plaintiff,           §
                             §
v.                           §        CIVIL ACTION NO. 10-CV-247
                             §
ST. LUKE'S EPISCOPAL HOSPITAL, §
                             §
        Defendant.           §
                             §

### MEMORANDUM OPINION AND ORDER

Pending before the court[1] are Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 9) and Defendant's Objections to Plaintiff's Evidence in Support of Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 23).  The court has considered the motion and objections, all relevant filings, and the applicable law.  For the reasons set forth below, the court **GRANTS IN PART, DENIES IN PART** Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 9).  Furthermore, the court **OVERRULES IN PART**, **SUSTAINS IN PART** Defendant's Objections to Plaintiff's Evidence in Support of Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 23).

## I.  Background

---

[1]     The parties consented to proceed before the undersigned magistrate judge for all proceedings, including trial and final judgment, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Docket Entry Nos. 21-22, 25.

## A.    Procedural History

Plaintiff Carlos Villarreal III ("Plaintiff") initiated this action on January 26, 2010, asserting on behalf of himself and all others similarly situated that defendant St. Luke's Episcopal Hospital ("Defendant" or "St. Luke's") violated the Fair Labor Standards Act[2] ("FLSA").[3]  Plaintiff seeks to certify a class of all current and former United States-based employees of Defendant who at any time between January 26, 2007, and the present worked for Defendant's Information Technology Services ("IT Services");[4] worked more than forty hours per week in one or more weeks; and did not receive payment for their hours worked in excess of forty at one-and-a-half times their regular rate of pay.[5]

In his present motion, Plaintiff asks the court: (1) to conditionally certify this suit as a collective action; (2) to authorize Plaintiff to send an approved notice of this action and a consent form to all non-managerial employees in IT Services in St. Luke's Episcopal Health System employed between January 26, 2007, and December 31, 2008; (3) to order production of names, last known mailing addresses, alternate addresses, all telephone

---

[2]     29 U.S.C. §§ 201-219.

[3]     Original Complaint, Docket Entry No. 1.

[4]     IT Services was formerly known as the "Information Management Division," or "IMD" for short.  <u>See</u> Defendant's Response, Docket Entry No. 24, Ex. A, Affidavit of Robicheaux, ¶ 5.  For clarity, the court uses the department's current name throughout this memorandum opinion.

[5]     Amended Complaint, Docket Entry No. 15, ¶ 38.

numbers, last known email addresses, and dates of employment of potential class members; and (4) to order Defendant to post the notice and consent forms in a place where potential class members are likely to view them.[6]

**B.  Factual History**

### 1.  Plaintiff's Allegations

Plaintiff brought this action on behalf of himself and all current and former employees of Defendant's IT Services who, between January 26, 2007, and December 31, 2008, provided technical support for computer hardware and/or software, including installing, configuring, testing, analyzing, maintaining, monitoring, backing up, or solving problems, and who were not paid for hours worked in excess of forty hours in any given week at a rate of one-and-a-half times their regular rate.[7]

Plaintiff claims that, prior to December 2008, Defendant classified its technical support employees as exempt and paid them a fixed salary which did not encompass any additional amounts or increased rates for hours worked in excess of forty in any given week.[8]   Plaintiff states that IT Services included all of Defendant's computer technical support employees, who were labeled

---

[6]    Plaintiff's Motion for Conditional Certification of a Collective Action ("Plaintiff's Motion"), Docket Entry No. 9, p. 2.

[7]    Id. at pp. 2-3.

[8]    Id. at Ex. A, Declaration of Plaintiff, ¶¶ 11-13; Ex. B, Declaration of Tran, ¶ 8; Ex. C, Declaration of Wroe, ¶ 10.

according to the types of hardware or applications on which they worked.[9]   In spite of these labels, Plaintiff avers that all of these employees had "a common purpose and function, which is to help the users of computers and computer related equipment . . . to get the most performance from their computers and to overcome problems or obstacles."[10]   In support of this assertion, Plaintiff claims that all non-managerial members of IT Services were required to respond to tickets, i.e., requests for help from users or other division personnel.[11]

Defendant maintained a uniform salary-only policy for all employees in IT Services.[12]   Plaintiff and putative class member Cheryl Wroe ("Wroe") each worked in multiple groups throughout their tenure with Defendant.[13]   Plaintiff primarily worked in the Technology Service Center ("TSC") group; Wroe primarily worked in the Information Management Applications group.[14]   Another putative class member, Marcus Tran ("Tran"), worked in both the TSC and the

---

[9]   Id. at Ex. A, Declaration of Plaintiff, ¶ 4.

[10]   Id. at Ex. A, Declaration of Plaintiff, ¶ 5; Ex. B, Declaration of Tran, ¶ 5; Ex. C, Declaration of Wroe, ¶ 5.

[11]   Id. at Ex. A, Declaration of Plaintiff, ¶ 11-13; Ex. B, Declaration of Tran, ¶ 8; Ex. C, Declaration of Wroe, ¶ 10. Ex. A 6, Ex. B 4, Ex. C 3 (second instance).

[12]   Id. at Ex. A, Declaration of Plaintiff, ¶ 13; Ex. C, Declaration of Wroe, ¶ 12.

[13]   Id.

[14]   Id. at Ex. C, Declaration of Wroe, ¶¶ 2, 6, 10.  This group was formerly known as the Administrative Applications group.  For clarity, the court uses the group's current name throughout this memorandum opinion.

IT Infrastructure & Computer Operations group.[15]

### 2.   St. Luke's IT Services[16]

St. Luke's IT Services consisted of five functional work groups, each supporting a different aspect of St. Luke's information technology needs.[17]

### a.   TSC

Plaintiff and Tran each worked in this group during the relevant period.[18]  The TSC provided technical support for all of St. Luke's employees, called "end users."[19]  The TSC group consisted of two teams: Help Desk and Desktop Support.[20]  The annual pay range for TSC employees ranged from approximately $43,000 minimum pay for a Help Desk employee to $73,000 maximum pay for a Desktop Support Analyst ("DSA").[21]  As of December 2008, all TSC employees were classified as non-exempt from the overtime provisions of the FLSA.[22]

---

[15]   Id. at Ex. B, Declaration of Tran, ¶¶ 2, 7-8.  This group was formerly known as the Enterprise Computer Services group.  For clarity, the court uses the group's current name throughout this memorandum opinion.

[16]   The court here relies on Defendant's well-organized, well-supported, and uncontested recitation of facts with respect to the organization of St. Luke's information technology services.  See Defendant's Response, Docket Entry No. 24, pp. 5-12.

[17]   Id. at Ex. A, Affidavit of Robicheaux, ¶¶ 5-10; Ex. B, Affidavit of Thorpe, ¶¶ 5-10

[18]   The court addresses the relevant period for this lawsuit infra, § III.2, n.101.

[19]   Id. at Ex. A, Affidavit of Robicheaux, ¶ 10; Ex. B, Affidavit of Thorpe, ¶ 10.

[20]   Id. at Ex. A, Affidavit of Robicheaux, ¶ 15.

[21]   Id. at Ex. A, Affidavit of Robicheaux, ¶¶ 17, 22.

[22]   Id. at 7 n.3; Ex. A, Affidavit of Robicheaux, ¶ 22.

Prior to then, only Help Desk employees were classified as non-exempt.[23]

Help Desk team members provided the first level of support for end users.[24] They took initial calls from end users, documented the calls by creating "tickets," fixed basic problems, and referred tickets they could not resolve to DSAs or to other groups, depending on the issue and technology involved.[25]

DSAs provided advanced technical support for end users.[26] They troubleshot issues arising in connection with desktop computers as well as ancillary equipment such as printers and fax machines.[27] Essentially, they resolved issues that Help Desk team members were unable to fix.[28]

Plaintiff worked as a DSA during the relevant period.[29] The job description for his position was as follows:

> [TSC] Desktop Support provides Tier-2 customer support, consultation, training and escalation assistance for the local and remote users of the St. Luke's information processing environment.  Users include, but are not limited to, employees and staff, physicians and business/clinical partners. The employee provides direct technical and operational support for desktop hardware

---

[23]    Id.

[24]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 16.

[25]    Id.

[26]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 17.

[27]    Id.

[28]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 18.

[29]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 20.

(e.g. personal computers, laptops, printers), software
(e.g. operating systems, office products, e-mail) and
business/clinical application systems.  The employee must
use strong customer service and technical abilities to
resolve assigned inquiries and problems, and complete
special projects.  The employee must demonstrate
excellent troubleshooting and problem resolution skills.
The employee must use appropriate methods to restore
services in a timely manner, including escalation to
other resources. Additionally, support includes 24-hour,
7-day "on-call" as necessary to resolve production
support issues.  The Team Lead or Supervisor may assign
other responsibilities as required to meet the overall
objectives of the TSC.[30]

DSAs such as Plaintiff thus rotated "on-call" responsibilities to
provide coverage twenty-four hours each day, seven days each week.[31]
This also meant that Plaintiff and other DSA staff were sometimes
required to work weekends to ensure coverage.[32]

### b.    IT Infrastructure & Computer Operations

This group primarily performed unique projects with respect to
Defendant's servers.[33]   In short, employees here were required to
perform any work relating to the primary and back-up servers.[34]  All
employees in this group were classified as exempt; their salaries
started at $80,000.[35]

More specifically, this group was responsible for maintaining

---

[30]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 21.

[31]    Id. at Ex. A, Affidavit of Robicheaux, ¶ 19.

[32]    Id.

[33]    Id. at Ex. B, Affidavit of Thorpe, ¶ 11; Ex. C, Affidavit of Martin,
¶ 4.

[34]    Id. at Ex. C, Affidavit of Martin, ¶ 4.

[35]    Id. at Ex. C, Affidavit of Martin, ¶ 13.

functionality of the servers on which applications and information were stored, along with implementing and maintaining networking devices and technology that ensured that the servers could maintain their connections with the desktops.[36]  Each server had an analyst who was the primary employee for that server.[37]  This analyst was required to have detailed knowledge of his server; to support and monitor the server; and to ensure that Defendant's employees were receiving the necessary information from the server.[38]  Sometimes this analyst was required to respond to tickets, as filtered through the TSC, when they specifically related to his own server, but this accounted for no more than twenty percent of time in any given week.[39]

Tran worked for this department as a Network Technology Analyst during the relevant period, and he was responsible for improving Defendant's servers and ensuring that they were operated using best practices.[40]  His job description was as follows:

> The Network Technology Analyst performs a supporting technical role in providing technical design, implementation, and operational assistance/support in at least two of the following key areas: (1) network planning, and design; (2) network management and monitoring; (3) network systems administration and

---

[36]   Id. at Ex. B, Affidavit of Thorpe, ¶ 11; Ex. C, Affidavit of Martin, ¶ 5.

[37]   Id. at Ex. C, Affidavit of Martin, ¶ 6.

[38]   Id.

[39]   Id. at Ex. C, Affidavit of Martin, ¶ 7.

[40]   Id. at Ex. C, Affidavit of Martin, ¶ 10.

support; (4) enterprise-wide applications systems
interoperability testing and integration; (4) network and
client hardware and applications technical support; and
(6) network and client hardware and applications
customer/end-user support, consultation, and training.
Additionally, the Network Technology Analyst will be
asked to serve as the project leader on selected small-
scale enterprise networking and applications systems
projects.[41]

Tran's position required "constant analysis and the ability to
make split-second judgment calls."[42]  He was responsible for
ensuring that the system was properly configured to operate
efficiently; bad judgment calls here could cause major system
problems, so the position required advanced, unique skills.[43]  Tran
and others on his team were required to be on-call once every eight
weeks.[44]

In addition, once each year, Tran and his fellow employees
were required to perform a server refresh process, which required
taking information from an old server and putting it on a new one,
during which time programs on that server would be unavailable to
any of Defendant's employees.[45]  This was a complex, critical
process and required an advanced, specific skill set; thus, this
sort of task would never be handled by a DSA.[46]

---

[41]    Id. at Ex. C, Affidavit of Martin, ¶ 9.

[42]    Id. at 8; Ex. C, Affidavit of Martin, ¶ 10.

[43]    Id. at Ex. C, Affidavit of Martin, ¶ 10.

[44]    Id. at Ex. C, Affidavit of Martin, ¶ 11.

[45]    Id. at Ex. C, Affidavit of Martin, ¶ 12.

[46]    Id.

9

### c.   Telecommunications & Security Services

The primary responsibility of this group was to implement and maintain safeguards to ensure that the computer system was secure and private.[47]  The annual pay ranged from $30,000 for a telephone operator to around $98,000 for a senior analyst.[48]  Employees in this group were exempt, with the exception of telephone operators, a telecom services analyst, and an administrative secretary.[49] Exempt employees were required to have a four-year college degree.[50]

This group was composed of four teams: (1) Telecom Operators & Call Center Services, which answered and transferred calls and handled paging; (2) Information Protection, which handled change management, HIPAA privacy, and security; (3) Telecom Billing; and (4) Administration, which handled contracts, budgets, management reports, and administrative support.[51] All of the teams, except the Telecom Operators and Call Center Services team, ensured that applications were secure from unauthorized access and intrusion.[52] In other words, the group was primarily responsible for ensuring that proper security measures were in effect and certifying that

---

[47]   Id. at Ex. B, Affidavit of Thorpe, ¶¶ 5, 12; Ex. D, Affidavit of Williams, ¶ 5.

[48]   Id. at Ex. D, Affidavit of Williams, ¶ 10.

[49]   Id.

[50]   Id.

[51]   Id. at Ex. D, Affidavit of Williams, ¶ 4.

[52]   Id. at Ex. D, Affidavit of Williams, ¶¶ 5-6.

applications were compliant with security policies.[53]    In
particular, the Information Protection team focused on all aspects
of information protection and conducted forensic investigations
involving improper or unauthorized use of Defendant's computers by
employees, along with enforcing policies for passwords and data
encryption.[54]

### d.   Application Technology Services

Application Technology Services, formerly known as the
Technology Implementation group, had the primary responsibility of
distributing applications and ensuring they functioned properly.[55]
These employees were generally required to have a four-year college
degree, had a pay range of between $69,000 and $116,000 per year,
and were all classified as exempt.[56]

The group oversaw the implementation and maintenance of
advanced applications on Defendant's servers.[57]    Its
responsibilities were only to ensure that applications were
correctly installed and operated within the other information
technology infrastructure; the team was not responsible for issues

---

[53]    Id. at Ex. D, Affidavit of Williams, ¶ 5.

[54]    Id. at Ex. D, Affidavit of Williams, ¶¶ 6-7.

[55]    Id. at Ex. E, Affidavit of Wallace, ¶¶  3-4.

[56]    Id. at Ex. E, Affidavit of Wallace, ¶ 6.

[57]    Id. at Ex. B, Affidavit of Thorpe, ¶ 13; Ex. E, Affidavit of Wallace,
¶ 4.

arising within the applications themselves.[58]  The team also distributed applications; developed specifications for in-coming applications; implemented the applications to ensure they worked and functioned properly; handled the use of interface engines between applications; encrypted data on laptops; and handled back-end database structures.[59]

### e.  Information Management Applications

This group was responsible for software applications, such as patient care and billing, with specific analysts assigned to different applications.[60]  All employees were classified as exempt and were required to have a four-year degree.[61]  They were also all required to have at least five years of relevant experience and specialized skills, such as experience and knowledge with respect to host and client server architectures, logical and physical data architectures, and a history of development of projects in a medium-to-large data processing environment with mainframes, mid-range, and client servers.[62]  Non-managerial employees were paid between $62,000 and $116,000 a year, while the pay for systems analysts ranged from $62,000 to $104,000 a year.[63]

---

[58]     Id.

[59]     Id.

[60]     Id. at Ex. B, Affidavit of Thorpe, ¶ 15.

[61]     Id. at Ex. B, Affidavit of Thorpe, ¶ 24.

[62]     Id.

[63]     Id.

These analysts were required to have in-depth knowledge of databases, including their build and application configurations.[64] They needed to know the function and purpose of each application, how it served that function, and the methods by which the application could be manipulated with programming to better serve its function and to resolve issues.[65]   They would address tickets only when the identified problems implicated the applications being utilized.[66]   This troubleshooting was secondary to the larger focus of development and maintenance of the applications.[67]   They also participated in strategic development planning.[68]

Wroe worked as a systems analyst in this group.[69]  Her job description was as follows:

> Under the direction of the Manager or Project Manager, working in a team environment on large projects or independently on small projects, the Systems Analyst performs software upgrades, maintenance, new software implementation projects with vendor provided software, or custom developed enhancements and interfaces. Coordinates and provides problem resolution, technical analysis, costs and resource estimates, work plans, workflow documentation, and progress reports on assigned projects. Assists assigned customer areas in identifying potential benefits, setting standards, developing procedures, and re-engineering business and clinical processes to achieve expected benefits of new and

---

[64]   Id. at Ex. B, Affidavit of Thorpe, ¶ 16.

[65]   Id.

[66]   Id. at Ex. B, Affidavit of Thorpe, ¶ 17.

[67]   Id. at Ex. B, Affidavit of Thorpe, ¶ 18.

[68]   Id.

[69]   Id. at Ex. B, Affidavit of Thorpe, ¶ 19.

existing systems.   Provides production support and functional assistance.[70]

Wroe's position thus required advanced knowledge of the processing behind the data and how to determine what was happening during the process.[71]   This required developing and using code, along with the ability to program how to generate reports for end users for the various applications that the hospital used.[72]   Wroe was also required to transfer data from the mainframe into applications; she claims that she was the only person in her department who had the knowledge and expertise to work in the mainframe.[73]

## II.  Defendant's Objections to Plaintiff's Declarations

Defendant objects to portions of three declarations submitted by Plaintiff in support of his motion for conditional class action certification.[74]

## A.   Plaintiff's Declaration

Defendant objects to Plaintiff's references to "computer technical support staff" as vague and lacking foundation because Plaintiff does not provide detailed information regarding the

---

[70]     Id. at Ex. B, Affidavit of Thorpe, ¶ 20.

[71]     Id. at Ex. B, Affidavit of Thorpe, ¶ 21.

[72]     Id. at Ex. B, Affidavit of Thorpe, ¶¶ 21-22.

[73]     Id. at Ex. B, Affidavit of Thorpe, ¶ 23.

[74]     Defendant's Objections to Plaintiff's Evidence in Support of Plaintiff's Motion ("Defendant's Objections"), Docket Entry No. 23.

composition of such a group.[75]   The court disagrees.

Here, Plaintiff sufficiently describes the composition of this group.   First, Plaintiff states that this group is within IT Services.[76]   Second, he states that the group is composed of those employees whose purpose and function is to assist the users of computers and computer-related equipment in various departments of St. Luke's.[77]   Third, Plaintiff provides a description of what the relevant employees within each group of IT Services does.[78]   The court does not find these descriptions to be so vague that these portions of Plaintiff's declaration should be stricken.

Defendant also objects to Plaintiff's statements regarding the areas of responsibilities, purposes, and functions of various employees located in different departments within St. Luke's IT Services as lacking foundation because Plaintiff failed to specify in which positions those employees worked and failed to state how he came to have personal knowledge of the information.[79]   Defendant

---

[75]   Id. at pp. 2-4 (objecting to ¶¶ 3-4 & 12 of Plaintiff's declaration).

[76]   Plaintiff's Motion, Docket Entry No. 9, Ex. A, Declaration of Plaintiff, ¶ 4.

[77]   Id. at Ex. A, Declaration of Plaintiff, ¶ 5.

[78]   Id. at Ex. A, Declaration of Plaintiff, ¶ 4 ("[E]mployees of the [TSC] are responsible for all desktop or laptop computers in all St. Luke's departments and facilities.   The employees of [IT Infrastructure & Computer Operations] are responsible for supporting the servers to which most desktops or laptops are connected.   The employees of [Information Management Applications] help the accounting or business departments when their computer applications fail to perform as expected.").

[79]   Defendant's Objections, Docket Entry No. 23, pp. 4-5 (objecting to ¶¶ 4-5 of Plaintiff's declaration).

further objects to Plaintiff's statement that "St. Luke's required all non-managerial members of [IT Services] to respond to 'tickets,' which are requests for help from other employees of St. Luke's," as lacking foundation because Plaintiff failed to state how he came to have personal knowledge of the requirements and expectations of this group.[80]

Plaintiff worked within IT Services and claims to have personal knowledge of the various positions within IT Services' groups.  By virtue of his position, he has properly stated a basis upon which he may have gained personal knowledge of the organization by way of his day-to-day work and interaction with other employees of IT Services during his tenure with Defendant. Defendant's objections here are overruled.

Defendant also claims that Plaintiff cannot have personal knowledge of the work schedules of members of the computer technical support staff.  Plaintiff supports his general statements by stating that he personally observed extra hours worked by some other members.  Defendant's objection is overruled.

Further, although Defendant asserts that Plaintiff has stated that Defendant was in violation of the FLSA because these employees were owed compensation for their overtime hours, Plaintiff actually did not state such.  Plaintiff only stated that these employees complained of not being compensated for their overtime hours (a

---

[80]     Id. at 5 (objecting to ¶ 6 of Plaintiff's declaration).

factual assertion), not that the FLSA had been violated because they were actually owed compensation for overtime hours (a legal determination). Thus, Defendant's objection here is also overruled.

Finally, Defendant objects to Plaintiff's statement that "I know that the other computer technical support employees were salaried, because many of them said so. They also complained of the lack of 'comp-time' or other compensation for their overtime hours," as inadmissible hearsay.[81]  To the extent that these statements are offered for the truth of the statements therein, Defendant's objection is sustained. However, whether true or not, these statements provide a basis for Plaintiff's belief that aggrieved individuals exist who may be owed overtime compensation. Accordingly, Defendant's objection is overruled to that extent.

Thus, the court overrules in part, sustains in part Defendant's objections to Plaintiff's declaration.

**B.   Tran's Declaration**

Defendant objects to the descriptions of the two positions held by Tran during his ten years at St. Luke's as vague because Tran failed to state the time frames within that ten-year period for which he worked in each of the groups.[82]

At the hearing held on August 13, 2010, the period Tran worked

---

[81]    Id. at 5-6 (objecting to ¶ 12 of Plaintiff's declaration).

[82]    Id. at 6 (objecting to ¶¶ 2-7 of Tran's declaration).

17

for each of the groups was clarified.  He worked in the TSC from some time in 2001 until mid-2008; then, from mid-2008 until March 15, 2010, he worked for IT Infrastructure & Computer Operations.[83] Because Plaintiff's lawsuit alleges violation of the FLSA from January 27, 2007, to the present, Tran clearly worked in each of the two groups during the relevant period.  Thus, the information he provides in relation to each of his positions is relevant and is not so vague as to be inadmissible.  Therefore, the court overrules Defendant's objection on this ground.

Defendant also objects to Tran's statements with respect to the other employees within his groups as vague and lacking foundation, because Tran did not work in each position within each group and, thus, Defendant avers, he cannot provide competent testimony with respect to other positions within the group.[84]

Tran need not have worked in each position within each of his groups to competently testify as to whether his colleagues tended to work overtime.  He has only testified with respect to what was generally expected of the members of his groups and as to his observations that the employees of these groups tended to work overtime.[85]  Tran's assertions are therefore sufficient to show that

---

[83]    See Plaintiff's Motion, Docket Entry No. 9, Ex. B, Declaration of Tran, ¶ 2.

[84]    Defendant's Objections, Docket Entry No. 23, pp. 6-7 (objecting to ¶ 6 of Tran's declaration).

[85]    Plaintiff's Motion, Docket Entry No. 9, Ex. B, Declaration of Tran, ¶ 6.

he had personal knowledge of the matters to which he testified concerning other employees within his groups.  See Fed. R. Civ. P. 602.  Therefore, the court overrules Defendant's objection on this ground.

Thus, the court overrules all of Defendant's objections to Tran's declaration.

## C.   Wroe's Declaration

Defendant objects to Wroe's statement that:

> I know that other computer technical support employees
> have worked substantial overtime, because I have
> personally seen them working late.  For example, I know
> that one of my peers in the computer technical support
> department routinely worked twelve hours a day, and
> worked at least five days a week.[86]

Defendant argues that the terms "computer technical support staff," "staff," and "department" are not defined by Wroe's affidavit or by reference to a defined group within the St. Luke's community and thus are vague and lack foundation .[87]

Wroe states that she worked for St. Luke's Information Management Applications group as a systems analyst, helping solve problems with the computer applications used in accounting, payroll, and similar bookkeeping functions.[88]  In the paragraph to

---

[86]    Plaintiff's Motion, Docket Entry No. 9, Ex. C, Declaration of Wroe, ¶ 11.

[87]    Defendant's Objections, Docket Entry No. 23, p. 7.  The court notes that the word "staff" does not appear in the paragraph that Defendant has objected to, and thus any objection to this word is overruled.  See Plaintiff's Motion, Docket Entry No. 9, Ex. C, Declaration of Wroe, ¶ 11.

[88]    Plaintiff's Motion, Docket Entry No. 9, Ex. C, Declaration of Wroe, ¶¶ 2-3.

which Defendant objects, Wroe refers to "one of [her] peers in the computer technical support department."[89]   As Wroe had previously described with particularity in which department she worked, reference to her peer clearly refers to a colleague within her own department.  She is not required to name her peer for this portion of her declaration to be admissible.  Further, for purposes of this motion, the court does not find that the words "computer technical support employees" are so vague as to be inadmissible.  Finally, Plaintiff's statement that "other computer technical support employees have worked substantial overtime" is clearly not lacking foundation, as she alleges that she had personally seen them working late.   Defendant's objection to this paragraph is overruled.

Accordingly, Defendant's objections to evidence submitted by Plaintiff in support of his motion for conditional class certification is **OVERRULED IN PART**, **SUSTAINED IN PART**.

### III.   Conditional Class Certification

**A.   Legal Framework**

**1.   Class Action Certification Under the FLSA**

The FLSA requires covered employers to pay non-exempt employees for hours worked in excess of defined maximum hours.  29 U.S.C. § 207(a).  It allows employees to bring an action against their employers for violation of its hour and wage provisions.  <u>See</u>

---

[89]     <u>Id.</u> at Ex. C, Declaration of Wroe, ¶ 11.

29 U.S.C. §§ 215-216.  An employee may bring this action against his employer on "behalf of himself . . . and other employees similarly situated.  No employee shall be a party plaintiff to any such an action unless he gives his consent in writing to become a party and such consent is filed in the court in which such action is brought."  29 U.S.C. § 216(b).  Courts have the authority to implement the representative action process by facilitating notice to potential plaintiffs, i.e., to persons alleged to be "similarly situated" to the named plaintiff(s).  Hoffman-La Roche, Inc. v. Sperling, 493 U.S. 165 (1989).

In the Fifth Circuit, the determination of whether plaintiffs are "similarly situated" is generally made by using one of two analyses: (1) the two-step analysis described in Lusardi v. Xerox Corporation, 118 F.R.D. 351, 359 (D.N.J. 1987), or (2) the "spurious class action" analysis described in Shushan v. University of Colorado, 132 F.R.D. 263 (D. Colo. 1990).  See Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1216 (5th Cir. 1995) (expressly declining to decide which of the two analyses is appropriate).[90]

Under the Lusardi approach, the court first "determines whether the putative class members' claims are sufficiently similar to merit sending notice of the action to possible members of the

---

[90]    Mooney v. Aramco Services Co. was an action under the Age Discrimination in Employment Act ("ADEA"), but it applies here because the ADEA explicitly incorporates Section 216(b) of the FLSA to there also provide for an "opt-in" class action procedure for similarly-situated employees.  See Mooney, 54 F.3d at 1212.

class." _Acevedo v. Allsup's Convenience Stores, Inc._, 600 F.3d
516, 519 (5th Cir. 2010) (citing _Mooney_, 54 F.3d at 1213-14).  The
court makes this determination by using a fairly lenient standard,
requiring only "substantial allegations that the putative class
members were together the victims of a single decision, policy, or
plan."  _Mooney_, 54 F.3d at 1214 & n.8.  If the court determines
that the employees are similarly situated, then notice is sent and
new plaintiffs may "opt in" to the lawsuit.  _Acevedo_, 600 F.3d at
519 (citing _Mooney_, 54 F.3d at 1214).  Next, once discovery has
largely been completed, and, thus, more information on the case
made available, the court makes a final determination on whether
the plaintiffs are similarly situated and whether they can proceed
together in a single action.  _Id._

    According to the Fifth Circuit, the _Shushan_ approach, known as
the "spurious class action" analysis, is similar to the class
certification procedure used under Federal Rule of Civil Procedure
23 ("Rule 23"):

> _Shushan_ espouses the view that [29 U.S.C. § 216(b)
> ("Section 216(b)")] merely breathes new life into the so-
> called "spurious" class action procedure previously
> eliminated from [Rule 23].  Building on this foundation,
> the court determined that Congress did not intend to
> create a completely separate class action structure for
> the FLSA . . . context, but merely desired to limit the
> availability of Rule 23 class action relief under . . .
> [the FLSA].  In application, the court determined that
> Congress intended the "similarly situated" inquiry to be
> coextensive with Rule 23 class certification.  In other
> words, the court looks at "numerosity," "commonality,"
> "typicality" and "adequacy of representation" to
> determine whether a class should be certified.  Under

22

>      this methodology, the primary distinction between a . .
>      . [FLSA] representative action and a [Rule 23] class
>      action is that persons who do not elect to opt-in to the
>      . . . [FLSA] representative action are not bound by its
>      results.  In contrast, Rule 23 class members become party
>      to the litigation through no action of their own, and are
>      bound by its results.

Mooney, 54 F.3d at 1214.

The Fifth Circuit has not ruled which method the courts should use to determine whether plaintiffs are sufficiently "similarly situated" to advance their claims together in a single action under Section 216(b).  Acevedo, 600 F.3d at 518-19.  Although it has stated that not all class action standards are applicable to Section 216(b) actions, it has explicitly left open the question of whether the Lusardi approach, the Shushan approach, or some third approach should be used in determining whether employees' claims are sufficiently similar to support the maintenance of a representative action.  Id. (citing Mooney, 54 F.3d at 1216; LaChapelle v. Owens-Ill., Inc., 513 F.2d 286, 288 (5th Cir. 1975)).

However, most courts in this District follow the Lusardi approach in suits under Section 216(b).  See, e.g., Tolentino v. C & J Spec-Rent Servs., Inc., No. C-09-326, 2010 WL 2196261, at *3 (S.D. Tex. May 26, 2010) (collecting cases).  The Lusardi approach is consistent with Fifth Circuit dicta, stating that the two-step approach is the typical manner in which these collective actions proceed.  Sandoz v. Cingular Wireless LLC, 553 F.3d 913, 915 n.2 (5th Cir. 2008).  The Fifth Circuit has also stated that "[t]here

is a fundamental, irreconcilable difference between the class action described by [Rule 23] and that provided for by [Section 216(b)]," i.e., the "opt out" procedure for class members under Rule 23 as opposed to the "opt in" procedure under Section 216(b). LaChapelle, 513 F.2d at 288; see also Donovan v. Univ. of Tex. at El Paso, 643 F.2d 1201, 1206 (5th Cir. 1981) ("The FLSA procedure, in effect, constitutes a congressionally developed alternative to the [Rule 23] procedures."). This court, therefore, will analyze Plaintiff's claims using the Lusardi method.

### 2. **Lusardi**

The present case is at the "notice stage" of the Lusardi analysis. At this stage, the court's decision is "made using a fairly lenient standard;" a plaintiff need only make a minimum showing to guide the court's determination in whether to issue notice to potential class members. Mooney, F.3d at 1214.

In lieu of Fifth Circuit guidance on the appropriate test to use at the notice stage of the Lusardi analysis, courts are split on the appropriate elements to consider in determining whether to grant conditional certification. Some courts use three elements, requiring the plaintiff to show that: (1) there is a reasonable basis for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit.

24

See, e.g., Cantu v. Vitol, Inc., No. H-09-0576, 2009 WL 5195918, at
*4 (S.D. Tex. Dec. 21, 2009) (unpublished); Tolentino, 2010 WL
2196261, at *8-9.  Other courts, however, have rejected the third,
non-statutory element.  See, e.g., Dreyer v. Baker Hughes Oilfield
Operations, Inc., No. H-08-1212, 2008 WL 5204149, at *3 (S.D. Tex.
Dec. 11, 2008) (unpublished); Heckler v. DK Funding, LLC, 502 F.
Supp. 2d 777, 780 (N.D. Ill. 2007).

     The court agrees that a plaintiff need not present evidence at
this stage of the third element, that aggrieved individuals
actually want to opt in to the lawsuit.  There are several reasons
for this.  First, as already stated, this element is not a
statutory requirement at this stage.  See 29 U.S.C. § 216(b).
Second, this element has not been required, or even discussed, by
any higher court opinion that this court has been able to find or
to which the parties have cited.  Rather, the Fifth Circuit's
discussion of the Lusardi approach only requires, at the first
stage, that "putative class members' claims are sufficiently
similar to merit sending notice of the action to possible members
of the class."  See Acevedo, 600 F.3d at 519 (citing Mooney, 54
F.3d at 1213-14).  Third, unlike under Rule 23, there is no
numerosity requirement in a FLSA class action lawsuit under the
Lusardi approach.  See, e.g., Badgett v. Tex. Taco Cabana, L.P.,
No. Civ.A.H 05-3624, 2006 WL 367872, at *2 (S.D. Tex. Feb. 14,
2006) (Lake, J.) (unpublished) (citing Mooney, 54 F.3d at 1214 &

25

n.8) (stating that "at the notice stage [in a FLSA action using the Lusardi approach], courts appear to require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan" (internal quotations omitted)).  Fourth, this element, requiring evidence of purported class members who are willing to join a class action before an appropriate class is even determined, is dissonant with the Supreme Court's directive that the FLSA be liberally construed to effect its purposes.  See Tony & Susan Alamo Found. v. Sec'y of Labor, 471 U.S. 290, 296 (1985).  Liberally construing the FLSA to effect its purposes, the court finds that it is enough for the plaintiff to present evidence that there may be other aggrieved individuals to whom a class action notice should be sent, without requiring evidence that those individuals actually intend to join the lawsuit.

Therefore, based on these considerations, the court finds that it need not determine whether Plaintiff has alleged sufficient information that aggrieved individuals are actually willing to opt in to this lawsuit.  The court will now proceed to look at the first two elements of the test.

**B.   Analysis**[91]

**1.   Existence of Aggrieved Individuals**

---

[91]     For the purposes of determining the outcome of this motion only, the court assumes that Plaintiff has stated a cognizable claim under Section 207 of the FLSA.

The court first notes that Defendant's argument here relies, in large part, upon its assertion that Plaintiff has not provided evidence that similarly-situated, aggrieved individuals exist.[92] That argument, however, impermissibly combines the first and second elements of the test.  See Cantu, 2009 WL 5195918, at *4.  The test for the first element is actually much more lenient than that; Plaintiff need only show that it is reasonable to believe that there are other aggrieved employees who were subject to an allegedly unlawful policy or plan.  See Morales v. Thang Hung Corp., No. 4:08-2795, 2009 WL 2524601, at *3 (S.D. Tex. Aug. 14, 2009) (Miller, J.) (unpublished); Prater v. Commerce Equities Mgmt. Co., Inc., No. H-07-2349, 2007 WL 4146714, at *5 (S.D. Tex. Nov. 19, 2007) (Rosenthal, J.) (unpublished).  In short, the court does not conduct a similarly-situated analysis until it examines the second element of the test.  See Cantu, 2009 WL 5195918, at *4.

Plaintiff presents the court with three declarations in support of his assertion that there were other non-exempt, aggrieved individuals who worked more than forty hours in a week but were not paid overtime.  Plaintiff's own declaration states:

> I know that other computer technical support employees
> have worked substantial overtime, because I have
> personally seen them working late.  For big projects such
> as large scale replacements of hardware or software

---

[92]     See Defendant's Response, Docket Entry No. 24, pp. 18-22.  The court also notes that Defendant's argument relies in large part upon its attack of the statements made in the declarations of Plaintiff, Tran, and Wroe.  Id.  The court has already dealt with those arguments and will not address them again here.  See supra § II.

updates to applications or operating systems, many of the computer technical support employees would come in to work over the weekends, together.  I know that other employees worked on-call, because sometimes they asked to trade on call time slots.  For example, I know that Julie Rector, Mario Zamora, Glenn Hickerson, Jim Christiansen, Marcus Tran, Solomon Medhin, and Rurik Wilmot worked more than forty hours in some weeks, because they worked after their regular schedule or on weekends.  I know that the other computer technical support employees were salaried, because many of them said so.  They also complained of the lack of "comp-time" or other compensation for their overtime hours.[93]

Similarly, Tran's declaration states:

. . . St. Luke's company policy required members of the [TSC] and [IT Infrastructure & Computer Operations] to serve "oncall" at regular intervals. [TSC] employees served on call about one week a month, and during that week were expected to respond to calls even very late at night or on weekends, whenever the user had a need. Employees of [IT Infrastructure & Computer Operations] served oncall about once every six weeks.  As a result, employees of the [TSC] and [IT Infrastructure & Computer Operations] tended to work more than forty hours in a week spent oncall, because we worked our regular daily shift, but still had to return in the evenings as needed. I routinely worked more than forty (40) hours per week during my on call periods.  Sometimes when I was oncall, I was required to return to the office late at night or early in the morning to address emergency problems with a computer or server.  However, prior to December 2008, I was classified as a salaried employee by St. Luke's and did not get paid for the hours I worked in excess of forty (40) per week at one and a half (1.5) times my regular rate.[94]

Wroe further states in her declaration that she regularly worked more than forty hours in a week but that she did not get

---

[93]     Plaintiff's Motion, Docket Entry No. 9, Ex. A, Declaration of Plaintiff, ¶ 12.

[94]     Id. at Ex. B, Declaration of Tran, ¶¶ 6-8.

paid for those extra hours.[95]  She also claims to have personally seen other employees in IT Services often working overtime, and she points to one colleague in particular whom she avers routinely worked twelve-hour days, five days a week.[96]

Together, these declarations allege that Tran, Wroe, and other named and unnamed employees of IT Services were allegedly treated in the same manner.  Each declaration provides allegations that Defendant failed to properly pay overtime wages.  They show that Defendant allegedly implemented the same policy with respect to different employees.  See, e.g., Ali v. Sugarland Petroleum, No. 4:09-cv-0170, 2009 WL 5173508, at *5 (S.D. Tex. Dec. 22, 2009) (Ellison, J.) (unpublished).  In light of these statements, the court finds that Plaintiff has shown that it is reasonable to believe that there are other aggrieved employees.

### 2.  Similarly Situated

Defendant contends that Plaintiff, along with Tran and Wroe, have failed to demonstrate that they are similarly situated to each other or to members of the proposed class.[97]

Potential class members are considered similarly situated to the named plaintiff if they are:

> "similarly situated" with respect to their job requirements and with regard to their pay provisions.

---

[95]   Id. at Ex. C, Declaration of Wroe, ¶¶ 6, 10-11.

[96]   Id.

[97]   See Defendant's Response, Docket Entry No. 24, pp. 22-27.

> The positions need not be identical, but similar.  A
> court may deny a plaintiff's right to proceed
> collectively only if the action arises from circumstances
> purely personal to the plaintiff, and not from any
> generally applicable rule, policy, or practice.

Yaklin v. W-H Energy Servs., Inc., No. C-07-422, 2008 WL 1989795,
at *2 (S.D. Tex. May 2, 2008) (Jack, J.) (unpublished) (internal
quotations and citations omitted).  If the job duties among
putative class members vary significantly, then class certification
should be denied.  See, e.g., Dreyer, 2008 WL 5204149, at *3;
Aguirre v. SBC Commc'ns, Inc., No. H-05-3198, 2007 WL 772756, at *9
(S.D. Tex. Mar. 12, 2007) (Rosenthal, J.) (unpublished).

Here, the court has already described the various groups and
teams within IT Services, including the groups for which Plaintiff,
Tran, and Wroe each worked.[98]  Plaintiff worked as a DSA in the TSC
group, which was composed of two teams: Help Desk and Desktop
Support.  The evidence shows that the Help Desk team provided the
first level of support for end users; Desktop Support provided the
second level of support, solving issues that Help Desk employees
were unable to resolve.  Although Desktop Support employees handled
more complex problems than did Help Desk employees, the court finds
that these two teams within the TSC group had sufficiently similar
job responsibilities to warrant collective action.  It is not
apparent that any differences between these two teams are relevant
or make the jobs so dissimilar as to deny collective action.  See,

---

[98]    See supra § I.B.2.

e.g., Tolentino, 2010 WL 2196261, at *7; Johnson v. Big Lots
Stores, Inc., Nos. 04-3201, 05-6627, 2007 WL 5200224, at *9 (E.D.
La. Aug. 21, 2007) (unpublished) ("To pursue claims against an
employer, plaintiffs must be similarly situated.  They do not have
to be identically situated." (emphasis omitted)).[99]

The employees of the TSC were "Jacks-of-all-trades."  The four
other groups within IT Services were different, however.  While
employees in each of these groups might work on issues that the TSC
team could not resolve, end-user issue resolution was not a primary
focus for any of these groups.  Rather, each of the four groups had
its own area of expertise.  IT Infrastructure & Computer Operations
specialized in the servers.  Telecommunications & Security Services
specialized in security and privacy.  Application Technology
Services specialized in advanced applications.  Information
Management Applications specialized in application functionality.
These groups were not primarily responsible for diagnosing and
addressing "break/fix" issues, as was the TSC.

Plaintiff states that all of the employees working in IT
Services had "a common purpose and function, which is to help the
users of computers and computer related equipment, at various
departments of St. Luke's, to get the most performance from their

---

[99]      Prior to December 2008, Help Desk employees were apparently already
classified as non-exempt. Defendant's Response, Docket Entry No. 24, p. 7 n.3;
Ex. A, Affidavit of Robicheaux, ¶ 22.  However, the record is not entirely clear
as to whether all of these employees were properly paid for overtime in
accordance with the FLSA.  As the court notes  infra, only if they were not
properly paid according to the time-and-a-half provisions of the FLSA may they
join this lawsuit.

computers and to overcome problems or obstacles."[100]  However true
this may be, the generic quality of the statement creates a far
broader categorization than that permitted under the "similarly-
situated" analysis.   While slight differences in job duties or
functions do not run afoul of the similarly-situated requirement,
significant variation of job duties among potential class members
means that class certification should not be granted.  See, e.g.,
Dreyer, 2008 WL 5204149, at *2.  Generally speaking, TSC employees
dealt with fixing the computer issues that arose on a daily basis
at St. Luke's; the other four groups specialized in the
implementation of and maintenance of specific software or hardware
issues.   They only occasionally dealt with complex "break/fix"
issues that arose with respect to their areas of expertise.  This
specialization prevents the court from finding that employees in
those groups are similarly situated to those employees who worked
in the TSC.

Therefore, the court finds that only those employees working
within the TSC are similarly situated.   Accordingly, the court
**GRANTS IN PART, DENIES IN PART** Plaintiff's motion to conditionally
certify class.

The following class is conditionally certified for purposes of
this FLSA collective action:

All current and former employees of St. Luke's Episcopal

---

[100]     Plaintiff's Motion, Docket Entry No. 9, p. 3.

32

> Hospital who held non-managerial positions in the Technology Service Center in the Information Technology Services department (formerly known as the Information Management Division) at any time between January 26, 2007, and December 31, 2008, and who were not paid for hours worked in excess of forty (40) in any given work week at one-and-a-half (1.5) times their regular rate.[101]

See Baldridge v. SBC Commc'ns, Inc., 404 F.3d 930, 931-32 (5th Cir. 2005) (stating that the court has the power to limit the scope of a proposed class in a FLSA collective action).

If Tran, Wroe, or any member of the IT Services department, other than those in the TSC, wish to proceed on a claim for overtime compensation under the FLSA, they must file a separate lawsuit.[102]

## C.   Notice

Having examined Plaintiff's and Defendant's proposed notices, the court finds that Defendant's notice should issue to proposed class members, with the exception that the limitations date should begin on January 26, 2007, not January 26, 2008, as the notice

---

[101]   The court has noted Defendant's argument that Plaintiff's lawsuit should be limited to a two-year (for negligent violation of the FLSA), as opposed to a three-year (for willful violation of the FLSA), statute of limitations. Because this argument goes to the merits of the case, and because Plaintiff has alleged intentional refusal to pay its employees in accordance with the requirements of the FLSA, the court conditionally certifies the class for the longer period.  See Amended Complaint, Docket Entry No. 15, ¶ 33.

There is a December 31, 2008 cut-off date as Plaintiff requests because after that time, Defendant allegedly reclassified its computer technical support employees as non-exempt under the FLSA, and thus Plaintiff and the putative class members have presumably been paid appropriately since that time.

[102]   The court notes that Tran allegedly worked for the TSC during part of the relevant period.  Accordingly, he may join this lawsuit only with respect to the time spent in his position in that group, and not with respect to his job in the IT Infrastructure & Computer Operations group.

currently states.[103]

Within fourteen (14) days of this opinion, Defendant shall provide Plaintiff with a list of all employees fitting the description of the conditionally certified class.  This list shall include each individual's full name, last known mailing address, any alternate addresses, date of birth, and date(s) of employment.[104]  Plaintiff shall have fourteen (14) days from the receipt of this information to mail the notice to the potential class members.

## IV.  Conclusion

Accordingly, the court **GRANTS IN PART, DENIES IN PART** Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 9).  Furthermore, the court **OVERRULES IN PART**, **SUSTAINS IN PART** Defendant's Objections to Plaintiff's Evidence in Support of Plaintiff's Motion for Conditional Certification of a Collective Action (Docket Entry No. 23).

**SIGNED** in Houston, Texas, this 3rd day of November, 2010.

Nancy K. Johnson
United States Magistrate Judge

---

[103]   Defendant's Response, Docket Entry No. 24, Ex. F, Notice of Pendency of FLSA Lawsuits; Ex. G, Consent to Join.

[104]   Defendant need not post the notice and consent forms in a place where potential class members are likely to view them, as Plaintiff requests.  Notice by mail is sufficient under the circumstances of this case.